ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

FILED

MAR - 7 2012
1:03

CLERK, U.S. DISTRICT COURT
By_____
Deputy

| | | |
|---|---|---|
| LUDIVINA ESTRADA and | § | |
| LEANN STARNES, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. |
| | § | |
| MICHAEL G. WALLACE; MICHAEL | § | |
| A. RICH; DONNA RICH; | § | 4-12CV-135-Y |
| SHERRI CUNNINGHAM; DONNA | § | |
| MAREZ; DAYBREAK PARTNERS | § | |
| L.L.C.; DAYBREAK VENTURE, L.L.C.; | § | |
| DAYBREAK HEALTHCARE, INC.; | § | |
| DAYBREAK THERAPY, L.L.C.; | § | |
| HEA MANAGEMENT GROUP, INC.; | § | |
| COLD SPRING HOLDINGS, L.L.C.; | § | |
| CANYON RIVER HOLDINGS, L.L.C.; | § | |
| DENTON RIVER HOLDINGS L.L.C.; | § | |
| SEVEN FALLS HOLDINGS, L.L.C.; and | § | |
| RED PINE HOLDINGS, L.L.C., | § | |
| | § | |
| Defendants. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

PLAINTIFFS, **LUDIVINA ESTRADA and LEANN STARNES,** hereby file their Original

Complaint against the following Defendants: **MICHAEL G. WALLACE; MICHAEL A. RICH;**

**DONNA RICH; SHERRI CUNNINGHAM; DONNA MAREZ; DAYBREAK PARTNERS**

**L.L.C.; DAYBREAK VENTURE, L.L.C.; DAYBREAK HEALTHCARE, INC.; DAYBREAK**

**THERAPY, L.L.C.; HEA MANAGEMENT GROUP, INC.; COLD SPRING HOLDINGS,**

**L.L.C.; CANYON RIVER HOLDINGS, L.L.C.; DENTON RIVER HOLDINGS L.L.C.;**

**SEVEN FALLS HOLDINGS, L.L.C.; and RED PINE HOLDINGS, L.L.C.** (collectively referred to herein as "Defendants"). Plaintiffs, for cause of action, would respectfully show the Court the following:

## PARTIES

1.  Plaintiff Ludivina Estrada is an individual who resides in Denton, Denton County, Texas.

2.  Plaintiff LeAnn Starnes is an individual who resides in Denton, Denton County, Texas.

3.  Defendant Michael G. Wallace ("Wallace") is an individual who resides at 2248 Carmel Drive, Carrollton, Texas 75006-2801 in **Dallas County, Texas** and may be served at his home or place of business at 401 North Elm Street, Denton, Texas 76201.

4.  Defendant Michael A. Rich ("Rich") is an individual who resides in Denton County, Texas and may be served at his place of business 401 North Elm Street, Denton, Texas 76201.

5.  Defendant Donna Rich ("D. Rich") is an individual who resides in Denton County, Texas and may be served at her place of business 401 North Elm Street, Denton, Texas 76201.

6.  Defendant Sherri Cunningham ("Cunningham") is an individual who resides in Denton County, Texas and may be served at her place of business 401 North Elm Street, Denton, Texas 76201.

7.  Defendant Donna Marez ("Marez") is an individual who resides in Denton County, Texas and may be served at her place of business 401 North Elm Street, Denton, Texas 76201.

8.  Defendant Daybreak Partners, L.L.C. is a domestic limited liability company subject to personal jurisdiction in the Northern District of Texas and maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Daybreak Partners, L.L.C. may be served with process by serving its registered agent for service of process

Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, Texas 79101.

9.     Defendant Daybreak Venture, L.L.C. is a domestic limited liability company subject to personal jurisdiction in the Northern District of Texas and maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Daybreak Venture, L.L.C. may be served with process by serving its registered agent for service of process Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, Texas 79101.

10.    Defendant Daybreak Healthcare, Inc. is a domestic company subject to personal jurisdiction in the Northern District of Texas and maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Daybreak Healthcare, Inc. may be served with process by serving its registered agent for service of process Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, Texas 79101.

11.    Defendant Daybreak Therapy, L.L.C. is a domestic limited liability company subject to personal jurisdiction in the Northern District of Texas and maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Daybreak Therapy, L.L.C. may be served with process by serving its registered agent for service of process Amarillo Corporate Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, Texas 79101.

12.    Defendant HEA Management Group, Inc. is a domestic company subject to personal jurisdiction in the Northern District of Texas and maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant HEA Management Group, Inc. may be

served with process by serving its registered agent for service of process Amarillo Corporate

Services, LLC, 500 S. Taylor, Suite 1100, LB 219, Amarillo, Texas 79101.

13. Defendant Cold Spring Holdings, L.L.C. is a domestic limited liability company which maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Cold Spring Holdings, L.L.C. may be served with process by serving its registered agent for service of process Michael G. Wallace, 401 North Elm Street, Denton, Texas 76201.

14. Defendant Canyon River Holdings, L.L.C. is a domestic limited liability which maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Canyon River Holdings, L.L.C. may be served with process by serving its Registered Agent, Michael G. Wallace, 401 North Elm Street, Denton, Texas 76201.

15. Defendant Denton River Holdings, L.L.C. is a domestic limited liability company which maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Denton River Holdings, L.L.C. may be served with process by serving its Registered Agent, Michael G. Wallace, 401 North Elm Street, Denton, Texas 76201.

16. Defendant Seven Falls Holdings, L.L.C. is a domestic limited liability company which maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201. Defendant Seven Falls Holdings, L.L.C. may be served with process by serving its Registered Agent, Michael G. Wallace, 401 North Elm Street, Denton, Texas 76201.

17. Defendant Red Pine Holdings, L.L.C. is a domestic limited liability company which maintains its corporate headquarters at 401 North Elm Street, Denton, Texas 76201.

Defendant Red Pine Holdings, L.L.C. may be served with process by serving its Registered Agent, Michael G. Wallace, 401 North Elm Street, Denton, Texas 76201.

## FEDERAL QUESTION JURISDICTION AVERMENTS

18. This action arises under federal law giving this Court original jurisdiction pursuant to Title 28 U.S.C. §§ 1331, 1337. In addition to the averments set forth in this Complaint, including under the "Statement of the Claim" and "Causes of Action" and "Damages," the following averments are made in support of this Court's original jurisdiction over this matter:

   a. At all times relevant, Defendants (1) engaged in related business activities, *inter alia*, operating and providing services for long term care nursing facilities; (2) had a unified operation and/or were under common control, and (3) shared a common business purpose of, *inter alia*, providing long term care services for profit. Defendants form a single enterprise within the meaning of the Fair Labor Standards Act ("FLSA") Title 29 U.S.C. § 201 et. seq.;

   b. At all times relevant, Defendants were an employer of Plaintiffs within the meaning of the FLSA Title 29 U.S.C. § 201 et. seq.;

   c. At all times relevant, Defendants have been and are each an "employer" which employed "employees" and "engaged in commerce . . . [and] an enterprise engaged in commerce" as provided by Title 29 U.S.C. § 207 (a)(1);

   d. Defendants employed persons for workweeks wherein such persons worked in excess of forty hours (40) per workweek and yet were denied compensation for such excess employment/work, in violation of Title 29 U.S.C. § 215(a)(3) of the FLSA;

e.  Plaintiffs became aware of Defendants' failure to pay overtime and, in response, engaged in activity protected under the FLSA, including reporting to Defendants that Defendants were engaged in acts and practices which constituted violations of law under the FLSA;

f.  In response to Plaintiffs' protected activity, Defendants engaged in retaliatory and discriminatory conduct toward Plaintiffs and, ultimately, wrongfully discharged Plaintiffs from Defendants' employ, in violation of Title 29 U.S.C. § 215(a)(3);

g.  Defendants' violation of Title 29 U.S.C. § 215(a)(3) makes Defendants liable under 29 U.S.C. § 216(b) for such legal and equitable relief as may be appropriate to effectuate the purpose of FLSA Title 29 U.S.C. § 201 et seq, and, by this action, Plaintiffs seek judgment against Defendants for all such legal and equitable relief as may be appropriate.

## SUPPLEMENTAL/PENDANT JURISDICTION

19.  This Court has supplemental jurisdiction and/or pendant jurisdiction over an additional claim that is asserted by Plaintiffs against Defendants. Plaintiffs claim that by their retaliation and discrimination against Plaintiffs for reporting a violation of law, to wit, the FLSA, Defendants also violated Texas Health and Safety Code, Chapter 242.133. Because this state law claim is derived from a common nucleus of operative facts as Plaintiffs' cause of action under the FLSA, this Court has supplemental jurisdiction and/or pendant jurisdiction. *See, e.g.*, 28 U.S.C. § 1367(a); *Feigler v. Tidex, Inc.*, 826 F.2d 1435,1439-40 (5th Cir. 1987).

## VENUE FACTS

20.     Venue is proper in the Northern District of Texas because (a) the jurisdiction of this case is not founded upon diversity of citizenship, (b) Defendant Michael G. Wallace and several of the other business entity Defendants reside in the Northern District of Texas, and (c) all of the remaining Defendants reside in the State of Texas. *See* 28 U.S.C. §§ 1391(b) and (c). Moreover, Defendants Daybreak Venture, L.L.C., Daybreak Partners, L.L.C, Daybreak Healthcare, Inc., Donna Rich, Michael A. Rich, Donna Marez, Sherri M. Cunningham, and Michael G. Wallace operate multiple long term care nursing facilities located in the **Fort Worth Division of the Northern District of Texas**.

## STATEMENT OF CLAIM

**Plaintiff Estrada's employment relationship with Defendants begins.**

21.     Plaintiff Ludivina Estrada's ("Estrada") employment relationship with Defendants commenced in 1995 when she was hired by Defendants' business entities and/or predecessor entities, namely, Texas Health Enterprises, Inc. and HEA Management, Inc. At and before Estrada became an employee of Texas Health Enterprises, Inc. and HEA Management, Inc., these two corporate entities constituted a single business enterprise which operated nursing homes throughout the State of Texas. Estrada began work in the Payroll Department, overseeing the payrolls of over thirty-seven (37) nursing homes. In 1999, Estrada moved to the Finance Department and served as the assistant to the Corporate Treasurer and, in such position, reported directly to the Corporate Treasurer.

**Plaintiff Starnes' employment relationship with Defendants begins.**

22.    Plaintiff LeAnn Starnes' ("Starnes") employment relationship with Defendants commenced in 1999 when she was hired by Defendants' business entities and/or predecessor entities, namely, Texas Health Enterprises, Inc. and HEA Management, Inc. At and before Starnes became an employee of Texas Health Enterprises, Inc. and HEA Management, Inc., these two corporate entities constituted a single business enterprise which operated nursing homes throughout the state of Texas.

23.    At or near the time she was hired by Texas Health Enterprises, Inc. and HEA Management, Inc., Starnes reported to Stephen Moors, the Risk Manager and registered agent of Texas Health Enterprises, Inc. and HEA Management, Inc. Stephen Moors reported directly to the President of these business entities.

24.    Soon after Starnes was hired, Stephen Moors was replaced by attorney Lynne Renfro, whom Texas Health Enterprises, Inc. and HEA Management, Inc. hired as General Counsel.

25.    On or about October 5, 2000, Lynne Renfro replaced Stephen Moors as the registered agent for Texas Health Enterprises, Inc. and HEA Management, Inc.

26.    After Lynne Renfro's hiring, Starnes worked directly under the General Counsel and did so until Lynne Renfro's resignation/termination.

27.    During her time as General Counsel for Texas Health Enterprises, Inc. and HEA Management, Inc., Lynne Renfro oversaw the following changes in the structure of this business enterprise:

    a.    On or about February 23, 2001, the creation of a new limited liability company,

Daybreak Partners, L.L.C., which named Lynne Renfro as the company's registered agent;

b.      On or about April 9, 2001, the creation of a new limited liability company, Daybreak Venture, L.L.C., which named Lynne Renfro as the company's registered agent;

c.      On or about August 9, 2001, the correction of Texas Health Enterprises, Inc.'s Articles of Incorporation to reflect the corporation's new name, Daybreak Healthcare, Inc.; and

d.      On or about December 16, 2002, the creation of a new limited liability company, Daybreak Therapy, L.L.C., which named Lynne Renfro as the company's registered agent.

28.     Eventually, ownership in Daybreak Venture, L.L.C., Daybreak Therapy, L.L.C., HEA Management, Inc. and Daybreak Healthcare, Inc., was transferred to and/or centralized in the newly created company Daybreak Partners, L.L.C. Defendants Daybreak Venture, L.L.C., Daybreak Therapy, L.L.C., HEA Management, Inc., Daybreak Healthcare, Inc. and Daybreak Partners, L.L.C. are collectively referred to hereinafter as "Daybreak."

29.     Daybreak, by unified operation and/or common control, performed such activities related to a common business purpose, specifically, the operation of institutions primarily engaged in the care of the sick, the aged, the mentally ill or defective who reside on the premises of such institutions.

30.     On or about September 25, 2003, following a dispute, litigation and settlement agreement between Lynne Renfro and Daybreak, Lynne Renfro resigned as Daybreak's General

Counsel.

31. After Lynne Renfro's resignation, Daybreak promoted Starnes to the position of Risk Manager.

32. As Risk Manager, Starnes, with the assistance of outside counsel, assumed many of the duties and responsibilities previously held by Lynne Renfro as General Counsel and Stephen Moors as Risk Manager, including acting as Daybreak's registered agent. Furthermore, as Risk Manager, Starnes reported directly to the President of Daybreak.

33. As assistant to the Corporate Treasurer for Daybreak, Estrada oversaw the accounts of the seventy-four (74) nursing homes managed by Daybreak. Estrada's job duties included, among other things, opening accounts for the corporate office and each nursing home facility managed by Daybreak, supervising the receipt and disbursement of funds, protecting and keeping custody of Daybreak's funds, securities and other financial instruments, prepare financial reports for the Treasurer, and manage Daybreak's banking accounts and banking relationships. In 2001, Daybreak promoted Donna Marez ("Marez") to Corporate Treasurer and Estrada became Marez's assistant.

34. By 2010, the individuals who operated/managed and constituted the brain trust for Daybreak referred to themselves and were known as "the partners." At all times relevant, the partners were the following individuals:

   a. Defendant Donna Rich who was given the title of Vice President;

   b. Defendant Michael A. Rich who was given the title of President;

   c. Defendant Donna Marez who was given the title of Treasurer;

d.      Defendant Sherri Cunningham who was given the title of Secretary; and

e..     Defendant Michael G. Wallace who was given the title of Chief Financial Officer.

35.     Up until the Fall of 2010, except for the occasional instance when Rich was unavailable, Starnes reported directly to Rich. Starnes periodically reported to Wallace only on those occasions when Rich was unavailable.

36.     Up until the fall of 2010, Starnes and Estrada enjoyed a pleasant working relationship with both Rich and Wallace.

**Plaintiffs engage in protected activity under the FLSA.**

37.     On January 16, 2010, Estrada's husband, Vincent Estrada ("Vincent"), was hired by Daybreak and given the job title "Project Assistant Manager" with Daybreak's construction crew.

38.     Despite being a non-exempt employee under the FLSA, Daybreak wrongfully treated Vincent as an exempt employee and paid him salary while requiring him to work long overtime hours and to travel out-of-town without compensation for travel time.

39.     Based on Estrada's experience in payroll, she formed a good faith belief that Daybreak was not paying Vincent correctly in violation of the FLSA. Estrada was scared to speak with anyone about the problem for fear that Daybreak would retaliate against her. Despite her apprehension, Estrada decided to engage in the protected activity of reporting Daybreak's FLSA violations to her Supervisor, Marez, as well as Estrada's friend and co-worker Starnes.

40.     In or about late October or early November 2010, Estrada approached Starnes to discuss with her the fact that Vincent was working excess hours for Daybreak but was not being

compensated for such excess work.

41.     Specifically, Estrada revealed to Starnes that Daybreak was forcing Estrada's husband, who

        worked for Daybreak on the construction crew, to work overtime hours without overtime pay

        because he had been wrongfully classified as an exempt, salaried employee.

42.     Starnes engaged in the protected activity of advising Estrada that she believed Daybreak was

        indeed violating the law and further advised and encouraged her friend to assert her family's

        rights under the FLSA by reporting this ongoing violation of law to the Daybreak division

        charged with the responsibility of dealing with this issue – Human Resources.

43.     Estrada's situation fell outside of Starnes' job duties for Daybreak but because of her

        friendship with and concern for Estrada, Starnes indicated that she would also report the

        matter to Daybreak's Human Resources Director, Andy Shelton ("Shelton").

44.     Initially, Estrada requested that Starnes not report the violation for fear Daybreak would

        retaliate against Estrada and/or her husband for complaining about the violation of law.  In

        her position with Daybreak, Estrada was aware of the fact that there was a culture of

        disrespect for the law and strategies aimed at circumventing the law were openly discussed

        among the partners.  Estrada was aware of the fact that employees who engaged in protected

        activity that could be materially adverse to Daybreak were no longer considered "team

        players" and were subjected to discrimination and hostility.

45.     In her position with Daybreak, Starnes was well aware of the fact that one or more of

        Daybreak's partners routinely engaged in discriminatory and retaliatory acts against

        Daybreak employees who engaged in any protected activity that could be materially

detrimental to Daybreak. For example, it was not uncommon for partner D. Rich to vehemently complain about Daybreak employees who had sustained on-the-job injuries and made claims under Daybreak's non-subscriber plan and ultimately make statements the substance of which were "I want [him/her] gone" or "Get rid of [him/her]. "We can find a way to get [him/her] out."

46.     After discussing the FLSA violation with Estrada, Starnes also came to believe that Daybreak had wrongfully classified other Daybreak employees as exempt.

47.     Although she was concerned that the partners would react negatively to any reports concerning Daybreak's ongoing violations of the FLSA, Starnes hoped that she and Estrada would be treated differently than lower level employees given their long employment history with Daybreak as well as their apparent amicable relationships with the partners.

48.     Starnes approached the Human Resource Director Shelton and reported Daybreak's ongoing violation of the FLSA with regard to Estrada's husband. At the time Starnes made this report to Shelton, Shelton agreed that Estrada's husband had been classified incorrectly and should be an hourly employee.

49.     Starnes also reported to Shelton that Daybreak was violating the FLSA with regard to several other employees in the maintenance crew and at the corporate office who had been wrongfully classified as exempt employees. Shelton likewise agreed that these other employees were wrongfully classified and that he would begin working on remedying this ongoing violation of law.

50.     Estrada also complained of the violation to Marez, who was a "partner" of Daybreak. Marez

told Estrada that she needed to report this issue to Shelton. Marez expressed that she would be willing to go with Estrada when she reported to Shelton or Rich in an effort to assure Estrada that her job would be secure, despite the fact that she was reporting something that would be materially adverse to Daybreak.

51. Despite the fact that this situation fell within the purview of Daybreak's Human Resources Department, Starnes reported Daybreak's ongoing FLSA violations to her supervisor Rich. Rich appeared agitated with Starnes because of the report but made statements indicating that he would make sure the situation was taken care of with appropriate changes implemented.

52. After speaking with Starnes, Shelton sent a memo to various department heads requesting the departments to turn-in job descriptions of their employees.

53. In or about late November of 2010, James Davidson ("Davidson"), the Corporate Project Manager of Daybreak, mentioned to Estrada's husband that "corporate" would change him to an hourly employee effective January 1, 2011.

54. In or about late November 2010, Davidson mentioned that Estrada's husband would be compensated for his overtime hours worked while classified as a salaried employee.

55. Beginning January 1, 2011, as a result of Starnes' report, some employees, including Estrada's husband, were reclassified as nonexempt hourly employees.

56. Despite Starnes' report of the FLSA violations, Defendants did not pay any such reclassified workers the overtime pay they were lawfully owed from the overtime hours they had worked while being wrongfully classified as salaried workers.

57. Estrada engaged in further protected activity by asking Davidson on numerous occasions

about when Daybreak would compensate Vincent for the overtime hours. James Davidson assured Estrada that everything would be taken care of and that he would mention the situation to Rich.

58.     Despite Starnes' report of the FLSA violations, even after Defendants initiated such changes, other workers remained incorrectly classified as salaried, exempt employees.

**Defendants' retaliation begins.**

59.     After and as a result of her reports of Daybreak's ongoing FLSA violations, Starnes was subjected to hostile, discriminatory, and retaliatory treatment by and through Rich and Wallace.

60.     Estrada also began to be treated more cooly than before but Starnes, at this time, seemed to be the main focus of hostility.

**Plaintiff Starnes is stripped of responsibilities.**

61.     Rich and Wallace began systematically removing certain responsibilities from Starnes' supervision and control.

62.     Wallace began holding meetings involving subjects and responsibilities typically under Starnes' control and supervision. Wallace intentionally excluded Starnes from these meetings unless he needed Starnes to answer questions or provide information that he could not or was unable to answer or provide.

63.     Without notifying Starnes, Wallace began to assume certain responsibilities and perform certain tasks that prior to Starnes' report had always been performed by Starnes.

64.     Around this time, Rich and Wallace began to create a series of business entities for the stated

purpose of avoiding contractual financial obligations owed to Peter "Woody" Kern who was the former owner of Daybreak's predecessor companies. Rich indicated that it was his plan to position Daybreak in such a way as to make bankruptcy unavoidable and use the new entities as a way of re-starting Daybreak without any obligation to Peter "Woody" Kern. Although Starnes remained the registered agent of Daybreak and its subsidiary entities, after Starnes reported Daybreak's ongoing FLSA violation, Defendants named Wallace as the new entities' registered agent instead of Starnes, as shown below:

a.      On or about November 23, 2010, Defendants created Defendant Canyon River Holdings, L.L.C., which appears virtually identical to the other Daybreak entities, sharing the same address and officers/members except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

b.      On or about November 23, 2010, Defendants created Defendant Denton River Holdings, L.L.C., which appears virtually identical to the other Daybreak entities, sharing the same address and officers/members except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

c.      On or about March 11, 2011, Defendants created Defendant Cold Spring Holdings, L.L.C., which appears virtually identical to the other Daybreak entities, sharing the same address and officers/members except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered

agent.

d.  On or about March 14, 2011, Defendants created The Atrium of Bellmead, L.L.C. As an entity managed by Defendant Cold Spring Holdings, L.L.C. and sharing the same address with Daybreak, The Atrium of Bellmead, L.L.C. appears virtually identical to the other Daybreak entities except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

e.  On or about May 19, 2011, Defendants created Defendant Seven Falls Holdings, L.L.C., which appears virtually identical to the other Daybreak entities, sharing the same address and officers/members except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

f.  On or about June 16, 2011, Defendants created Defendant Red Pine Holdings, L.L.C., which appears virtually identical to the Daybreak entities, sharing the same address and officers/members except that Starnes was not designated as the registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

g.  On or about August 2, 2011, Defendants created LTC Elite, L.L.C., which lists Seven Falls Holdings, Inc. as a managing member and has the same address as the other Daybreak entities. LTC Elite, L.L.C. lists Wallace as its registered agent.

h.  On or about October 28, 2011, Defendants created Rock Creek Health and Rehabilitation L.L.C. As an entity managed by Cold Spring Holdings, L.L.C. and

sharing the same address with the other Daybreak entities, Rock Creek Health and Rehabilitation L.L.C. appears virtually identical to the other Daybreak entities except that Defendants did not designate Starnes as the entity's registered agent. Instead, Defendants designated Wallace as the entity's registered agent.

    i.    On or about November 08, 2011, Defendants created Mount Moriah Health and Rehabilitation L.L.C., which shares the same address as the other Daybreak entities and names Cold Spring Holdings, L.L.C. as the managing entity. Defendants designated Wallace as the entity's registered agent.

65.    While both Estrada and Starnes did carry out some employment functions for one or more of the new entities, Starnes was not appointed as the registered agent for any of such new entities. Prior to the day Starnes reported the FLSA violation, it had been the practice of the Daybreak entities to designate Starnes as the registered agent for the enterprises associated with Daybreak.

**Plaintiff Starnes is isolated in a hostile work environment.**

66.    After Starnes reported Daybreak's FLSA violations, Wallace and Rich began intentionally isolating Starnes at work.

67.    Prior to Starnes reporting Daybreak's FLSA violations, Rich had always made himself available for Starnes to report and discuss matters within her responsibility. After Starnes reported Daybreak's FLSA violations, Rich would routinely refuse to speak with Starnes on such matters requiring her to speak to Wallace instead.

68.    On occasions where a need arose and Wallace was out of the office, Rich would refuse to

speak with Starnes. Starnes would have to wait for Wallace to return before she could handle matters within her responsibility.

69. On occasions where a need arose and Wallace was in the office, Wallace would often refuse to work with Starnes, ignoring Starnes' questions and sometimes even ignoring Starnes' physical presence. For example, Wallace would pointedly refuse to look up from his desk and paperwork when Starnes would be in Wallace's office to ask a question.

70. Immediately after reporting Daybreak's FLSA violations to Defendants, Wallace and Rich acted as if they were angry with Starnes though the only thing that could be a cause of such anger was Starnes' reports of Daybreak's violations of law.

71. Starnes voiced her concerns regarding Defendants' treatment of her a number of times to both Defendants' outside counsel as well as her coworkers, including Estrada.

**Defendants arbitrarily deny Starnes a routine annual salary increase.**

72. As a result of Starnes reporting the FLSA violation, Defendants denied Starnes a salary increase for the first time since she started working with Defendants in 1999.

73. In February 2011, Starnes was up for a review and a salary increase. When Starnes did not initially receive either a review or an increase in pay she began asking Defendants about the review and annual pay increase.

74. After Starnes' oral requests were ignored, Starnes gave a written note to Sherri Cunningham (Secretary of Daybreak and the Daybreak "partner" overseeing staff reviews and the salary increase approval process) wherein Starnes questioned Defendants' refusal to provide Starnes a performance review and salary increase.

75.     Sherri Cunningham never responded to Starnes' request for a review of Defendants' decision to deny Starnes an annual salary increase in 2011.

76.     Since 1999, Starnes had never received a disciplinary notice or been written-up on poor reviews.

77.     Since 1999, except for years where Defendants instituted companywide salary freezes, Starnes always received a salary increase.

78.     There was no companywide salary freeze in place at the time Starnes was denied her salary increase and other employees who had not reported FLSA violations received salary increases that year.

**Plaintiff Estrada reports Daybreak's continuing violations of FLSA.**

79.     By October 2011, despite Starnes' report of Daybreak's FLSA violations and Defendants' admitted need to correct its violations and pay overtime, Defendants had not compensated Estrada's husband for the overtime and travel-time hours both promised and owed.

80.     By October 2011, Estrada had, on numerous occasions, asked Daybreak's Corporate Project Manager Davidson when Defendants would pay her husband the overtime and travel-time owed. Despite Davidson's promise to address the issue with Rich, Defendants had not paid Estrada's husband for the overtime he was owed while wrongfully classified as a salaried employee.

81.     Late Sunday night, on October 30, 2011, Daybreak called Vincent and ordered him to work at a Daybreak facility commencing at 8:00 a.m. the very next day, October 31, 2011.

82.     On October 30, 2011, Daybreak forced Vincent to travel to and arrive at Corpus Christi

Texas by 8:00 a.m. on October 31, 2011.

83. In order to comply with this order, Vincent was required to leave his home in Denton County at approximately midnight in order to make the eight hour drive and arrive at Corpus Christi by 8:00 am.

84. Despite the reports of both Starnes and Estrada, Daybreak did not compensate Vincent's travel time, and only credited him with hours worked once he arrived in Corpus Christi and commenced doing what he was told to do.

85. Estrada was understandably upset by Daybreak's continued flouting of the FLSA and, despite witnessing Daybreak's retaliation against Starnes, Estrada decided to press the matter by reporting Daybreak's continued FLSA violations to Shelton.

86. On November 1, 2011, Estrada went directly to Shelton and complained that Defendants were still incorrectly paying her husband and had yet to pay her husband for travel-time and the overtime work performed while incorrectly classified as a salaried employee.

87. Shelton requested that Estrada have her husband place the request in writing so that Shelton could present the complaint to Rich.

88. On November 2, 2011, Estrada's husband emailed the complaint to Shelton for Defendants to review. At Shelton's request, Estrada's husband, with Estrada's help, compiled all the claimed uncompensated overtime hours and travel-time incurred and forwarded this information to Shelton for Defendants to review.

89. Shortly after providing Shelton with the Estradas' estimate of overtime owed to Vincent, James Davidson angrily confronted Estrada about why he was requesting Daybreak to

compensate him for travel-time. Vincent responded that the FLSA required Daybreak to pay him for travel-time and that Andy Shelton asked Vincent to compile the hours worked and not paid. Davidson stated that he would discuss this issue with Shelton.

**Plaintiff Estrada is subjected to increased retaliation.**

90.     After Estrada reported the FLSA violation, Defendants increased their retaliation against Estrada.

91.     After reporting the violation to Shelton, Daybreak, by and through its officers and employees, retaliated against Estrada because of such report by terminating Estrada's brother, Jesse Mendez ("Mendez"), from his employment with Daybreak.

92.     Like Estrada's husband, Mendez worked on Daybreak's construction crew and did not get paid for any travel-time.

93.     In November 2011, Daybreak assigned Mendez to work along with Estrada's husband on an assignment in Carrizo Springs in South Texas.

94.     However, in a stated effort to try and avoid paying FLSA overtime, Mendez and Estrada were not allowed to travel in the same car.

95.     Daybreak also required Estrada and Mendez to pay for their own gas and other expenses and then seek reimbursement from Daybreak later. Because Daybreak refused to provide Mendez an expense check to pay for Mendez's gas and because Mendez did not have enough money to pay for the gas to drive his own car to Carrizo Springs, he was terminated by Daybreak for not complying with the order to drive to Carrizo Springs for work. Mendez was wrongfully terminated on or about December 6, 2011.

96.    Defendants initially agreed to pay Estrada's husband for the overtime work claimed about December 9, 2011. However, when December 9 arrived, Estrada discovered that the amount Defendants paid omitted the request for travel-time in its entirety and a large amount of overtime work.

97.    Estrada complained to Shelton that the amount paid did not reflect the amount owed under law. Shelton claimed that Rich made the decision to take out travel-time.

98.    Later on December 9, Rich, through Starnes' assistant, told Estrada that he wanted to meet with Estrada after lunch and did not want her to be upset. After lunch, Rich called Estrada into his office and asked Estrada why she believed Estrada's husband was owed travel-time.

99.    During Estrada's meeting with Rich, Estrada explained that the labor law required Defendants to pay employees for travel-time. Rich argued that the law did not require such and stated that he did not understand where Estrada was getting this information, and then pointed to Starnes' office.

100.   Rich then agreed that if Estrada would send him a dollar amount Rich would approve the amount. Estrada later emailed Rich a dollar amount, which Defendants paid to Estrada's husband over the Christmas holidays.

101.   When Estrada returned to work after the holidays, Estrada noticed that Defendants began further distancing themselves from Estrada. For example, Rich would not even look at Estrada on occasions when they encountered one another in hallways.

**Plaintiff Starnes is also subjected to increased retaliation.**

102.   In November 2011, almost immediately after Estrada reported Daybreak's ongoing FLSA

violations as described above, Defendants escalated their retaliation against Starnes, who Defendants believed was ultimately responsible for Estrada's insistence that Defendants obey the FLSA and cure past violations.

103. Although Wallace typically ignored Starnes so that Wallace and Starnes had little to no communication, on November 3, 2011, after Estrada reported Defendants' continuing FLSA violations, Wallace emailed Starnes requesting Starnes to turn in vacation time for certain half-days worked.

104. On October 24 and 25, 2011, Starnes was off work due to injuries she suffered from a serious motor vehicle accident caused by a hit and run driver on or about October 23, 2011.

105. On October 26 and 27, Wednesday and Thursday, although Starnes was able to go to work, her condition did not allow her to stay full days.

106. On October 26 and 27, Starnes worked half-days, which was as long as her condition allowed her to work.

107. As was Starnes' custom, Starnes immediately gave Wallace notice of all the time she was off work.

108. Wallace had notice of the time Starnes was not at work prior to November 2, 2011, the day Estrada's husband emailed Defendants his written request for payment on past overtime work.

109. Prior to Wallace's November 3, 2011 email, Wallace had not requested Starnes to turn in vacation time for half-days worked due to sickness or injury.

110. Moreover, on November 3, 2011, the same day Wallace sent the email demanding for Starnes to turn in vacation time for half-days worked, whenever Starnes walked by Wallace, Wallace

appeared visibly angry and/or upset and would not even acknowledge Starnes when passing by. There was no other reason for Wallace to treat Starnes in this manner other than the fact that she had engaged in the protected activity described in this Complaint.

111.    In the days following November 3, 2011, Starnes received emails from Wallace and Rich accusing Starnes of entering into a settlement agreement without Defendants' authorization.

112.    Starnes explained to Wallace and Rich that the settlement agreement had been approved during a conference call between outside counsel, Starnes and Rich which took place while Wallace was on vacation.

113.    Wallace responded to Starnes' explanation by giving Starnes a deadline in which to resubmit a large amount of information involving all current litigation–information which Starnes had already turned over to Wallace *via* the accounting department that Wallace supervised.

114.    Despite having already turned over such information to Wallace, Starnes agreed to compile and send such information to Wallace a second time.

115.    During this time, Estrada and her husband were attempting to negotiate a resolution of the dispute concerning Daybreak's FLSA violations. While Estrada and her husband continued to negotiate with Defendants for a settlement of Estrada's husband's potential FLSA claim, Wallace, Rich and other partners made Starnes' work environment more hostile by refusing to look at and/or acknowledge her as she came into contact with them at the Defendants' corporate headquarters.

116.    During this time, both Estrada's and Starnes' fear of losing their jobs increased as Defendants' hostile work environment appeared to be building to a point that both Estrada and Starnes

would be wrongfully discharged.

117. One of the things that made both Estrada and Starnes more fearful about losing their jobs was unusual theatrical behavior of Rich. During this time, Rich began implementing heretofore unused skills of a thespian in order to build and plant a story that Daybreak needed to "lay-off" employees as a way to deal with threatened Medicare cuts. Rich began planting this pretextual story by speaking in an unnecessarily loud and theatrical voice while making statements ostensibly lamenting the fact that he was being forced to "lay-off" his son. Estrada and Starnes recognized the duplicity of Rich's performance because, prior to that time, Rich and others had already made statements indicating that Rich's son was planning on leaving Daybreak because he had taken a better job with one of Daybreak's vendors.

118. As Rich developed and planted the pretextual "lay-off" story he also made statements using his "stage voice" wherein he indicated that his mother (D. Rich) was the real decision maker regarding the operations at the corporate headquarters.

119. At the end of 2011, several of the partners received bonus checks totaling in the millions of dollars.

**Defendants wrongfully terminate Estrada and Starnes.**

120. On January 6, 2012, Defendants terminated both Starnes and Estrada. The partners who were the primary decision-makers in the decision to wrongfully terminate Starnes and Estrada were D. Rich, Rich, and Wallace. On information and belief, Marez and Cunningham acquiesced in the decision to wrongfully terminate Starnes and Estrada in violation of the law.

121. On January 6, 2012, Wallace called Starnes into his office and told Starnes that due to

Medicare cuts, Defendants were eliminating Starnes' position. Starnes was given a letter confirming her immediate termination. The letter stated that due to a reduction in Medicare funding, Daybreak was finding it necessary to "eliminate various jobs" and confirmed that Starnes' position was being eliminated effective immediately. The letter went on to state that "[t]his is a permanent layoff." The letter was signed by Rich.

122. Starnes asked Wallace for what reason she was being fired, and Wallace responded that Starnes' job performance was not at issue.

123. Starnes told Wallace that she believed Defendants were firing her because she reported the FLSA violations involving Estrada's husband. Wallace falsely claimed that he did not know what Starnes was talking about.

124. On January 6, 2012, Estrada went to Marez's office to tell her that Estrada was going to run a quick errand to the bank but before Estrada could leave, Marez called Estrada back into her office to have a meeting with Shelton.

125. Once Estrada was in Marez's office, Shelton handed a folder to Estrada and said the letter inside was self-explanatory. The letter stated that due to a reduction in Medicare funding, Daybreak was finding it necessary to "eliminate various jobs" and confirmed that Estrada's position was being eliminated effective immediately. The letter went on to state that "[t]his is a permanent layoff." The letter was signed by Rich.

126. Shelton asked Estrada if she had any questions. Estrada asked whether Daybreak was terminating Estrada because she reported the FLSA violation. Shelton responded by asking a second time if Estrada had any questions.

127. During the meeting Marez did not say a word, her eyes were watery, she was red in the face and shaking her head.

128. The stated reason for Starnes' and Estrada's wrongful discharge was pretextual and designed to avoid liability for Defendants' further violation of the FLSA by retaliating and discriminating against both Estrada and Starnes for their engaging in protected activity.

**Defendants' post-termination conduct further evidences Defendants' pretext.**

129. On information and belief, after terminating Starnes and Estrada, Defendants held a meeting with all the corporate office staff during which Rich announced that the positions held by Starnes and Estrada, along with two or three other employees, were being eliminated.

130. Except for Starnes and Estrada, Rich was unable to recall the names of the other employees whose positions had been eliminated and had to be reminded.

131. Starnes' assistant was not among the positions eliminated or employees terminated.

132. Rich also announced that Donna Marez would assume Estrada's responsibilities and Starnes' responsibilities would be outsourced.

133. On January 9, 2012, Rich called Starnes and left a voice message requesting Starnes to return his call.

134. When Starnes returned Rich's call, Rich told Starnes that he had learned from Wallace that Starnes believed her termination was due to reporting the FLSA violation involving Estrada's husband.

135. Rich explained to Starnes over the phone that her termination had nothing to do with

Estrada's husband's situation and that Defendants had been looking to replace Starnes with a paralegal since March of 2011.

136.   Starnes asked Rich if her position was being eliminated or if she was being fired and replaced. Rich responded that Wallace would assume most of Starnes' responsibilities and Defendants would hire a paralegal if needed.

137.   Rich then threatened Starnes, saying if Starnes sued Defendants, Rich would use a new law that would force Starnes to personally pay for Defendants' attorneys' fees.

138.   Since Starnes' and Estrada's termination, all of the *other* employees who were terminated along with Starnes and Estrada–except Rich's son–have now been reinstated by Defendants.

139.   Defendants are currently subjecting Estrada's husband Vincent to retaliatory and discriminatory conduct in an obvious effort to constructively discharge him.

### SINGLE ENTERPRISE

140.   Defendants are a single enterprise under the FLSA. As noted above Defendants are a collection of individuals and business entities which are engaged in the activity of owning, operating, and/or providing services for approximately seventy long-term and assisted living facilities throughout Texas. The business entities share the same corporate headquarters located at 401 North Elm Street in Denton, Texas. The business entities are a unified operation/enterprise and are essentially operated by the same individuals, including Defendants D. Rich, Rich, Marez, Cunningham, and Wallace. Among the services provided by Defendants are hospice care, skilled nursing care, respite care, long term care, physical therapy, nutritional therapy, and pharmacy services. Defendants share a common business

purpose in owning, operating, and/or providing services for long-term and assisted living facilities throughout Texas. Thus, the Defendants should be held jointly and severally responsible for the damages sustained by Starnes and Estrada.

## CAUSES OF ACTION

141. Defendants operate an enterprise engaged in commerce within the meaning of the FLSA, Title 29 U.S.C. § 201 et seq.

142. During all times relevant to this complaint, Defendants, as an employer, employed Starnes and Estrada as employees within the meaning of the FLSA.

143. While employed by Defendants, Starnes and Estrada engaged in activity protected by the FLSA under Title 29 U.S.C. 215 (a)(3).

144. Defendants deliberately and intentionally retaliated against and ultimately wrongfully discharged Starnes and Estrada as a result of their engaging in such protected activity and, in so doing, have violated Title 29 U.S.C. 215 (a)(3).

145. Defendants deliberately and intentionally retaliated against and ultimately wrongfully discharged Estrada and Starnes as a result of their engaging in such protected activity and, in so doing, also violated Texas Health & Safety Code section 242.133(b).

## ACTUAL DAMAGES

146. Starnes and Estrada contend that as a result of Defendants' wrongful conduct, each has suffered actual damages including the following damages:

    A.    severe mental anguish and emotional distress;

B.    lost wages and employee benefits in the past; and

C.    loss of wage earning capacity in the future.

Starnes and Estrada each plead for fair and reasonable compensation for their respective actual damages as authorized by the FLSA as well as Texas Health & Safety Code section 242.133 (c).

147.    Starnes and Estrada each seek to recover all reasonable attorneys' fees and costs which have been and will be incurred as a result of the prosecution of this case as authorized by the FLSA as well as Texas Health & Safety Code section 242.133 (c).

## EXEMPLARY DAMAGES

148.    The FLSA and Texas Health & Safety Code section 242.133 (c) authorize Estrada and Starnes to recover from Defendants exemplary damages. Accordingly, Starnes and Estrada each plead for an amount of exemplary damages sufficient to adequately punish Defendants and serve as an adequate warning to other employers.

## DEMAND FOR JUDGMENT

**WHEREFORE, PREMISES CONSIDERED,** Plaintiff Ludivina Estrada and Plaintiff LeAnn Starnes pray that Defendants be cited to appear and answer herein and that upon final hearing, Plaintiffs have judgment against Defendants, jointly and severally, for all damages alleged and pleaded herein, prejudgment interest as allowed by law, post-judgment interest, court costs and for such other and further relief to which they may show themselves to be entitled.

Respectfully submitted,

H. DUSTIN FILLMORE, III
State Bar No. 06996010
**CHARLES W. FILLMORE**
State Bar No. 00785861
**R. LAYNE ROUSE**
State Bar No. 24066007

**THE FILLMORE LAW FIRM, L.L.P.**
901 Lake Street
Fort Worth, Texas 76102
817/332-2351
817/870-1859 - Telecopier
chad@fillmorefirm.com
dusty@fillmorefirm.com
layne@fillmorefirm.com